FILED

2012 Jan-30  PM 04:45
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | | |
|---|---|---|
| **CHICAGO TITLE INSURANCE COMPANY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 4:09-CV-2035-VEH** |
| | ) | |
| **FIRST BANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

## I.   INTRODUCTION

Plaintiff (and Counter-Defendant) Chicago Title Insurance Company ("Chicago Title") initiated this insurance coverage action against First Bank on October 9, 2009. (Doc. 1).  Chicago Title's complaint contains two counts:  count one is for recision (Doc. 1 ¶¶ 41-48) and count two is for declaratory relief. (*Id.* ¶¶ 49-54).  Defendant (and Counter-Plaintiff) First Bank filed its answer and counterclaim on November 18, 2009.  (Doc. 11).

First Bank's claims against Chicago Title include (1) breach of contract for the failure to issue title insurance policy; (2) breach of contract for failure to provide title insurance coverage; (3) misrepresentation; (4) negligence; (5) breach of contract for

failing to indemnify and compensate; (6) and bad faith. (Doc. 11 at 6-14). Neither party has demanded a jury.

Now pending before the court are the parties' cross-motions for summary judgment, both of which were filed on August 15, 2011. (Docs. 27, 30). The motions have been fully briefed and are now under submission. (Docs. 28-29, 31, 33-36). As discussed more fully below, Chicago Title's Motion for Summary Judgment ("Chicago Title's Motion") is **DENIED**, and First Bank's Motion for Summary Judgment ("First Bank's Motion") is also **DENIED**.

## II.    STANDARD ON SUMMARY JUDGMENT

Courts should grant summary judgment when "there is no genuine issue of material fact . . . and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party always bears the initial responsibility of informing the district court about the grounds of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). In deciding whether the movant has met this burden, the court must examine the facts in the light most favorable to the non-moving party.  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157

(1970)); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Once the moving party has met this burden, the non-movant must then present evidence establishing that there is a genuine issue of material fact that precludes the entry of judgment as a matter of law in favor of the movant. *Celotex*, 477 U.S. at 325.

Additionally, "[i]f the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense [such as, an exclusion under an insurance policy], it must establish that there is no genuine issue of material fact as to any element of that defense." *International Stamp Art, Inc. v. U.S. Postal Service*, 456 F.3d 1270, 1273 -74 (11th Cir. 2006) (citation omitted). Also, although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955) ("Both parties filed and argued motions for summary judgment, but this does not warrant the granting of either motion if the record reflects a genuine issue of fact.").[1]

Accordingly, the court will consider each motion independently, and in accordance with the Rule 56 standard. *See U.S. v. Diebold, Inc.*, 369 U.S. 654, 655

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

(1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion.").  Finally, "[t]he fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." Wright, Miller & Kane, Fed. Practice & Proc. § 2720, at 327-28 (3d ed. 1998).

## III.   STATEMENT OF FACTS[2]

### A.   Background

On February 2, 2005, Coosa Pines Health Club, LLC ("Coosa Pines") borrowed $1,316,300 from Mutual Savings Credit Union ("Mutual Savings") secured by a mortgage on land, including a 440-acre parcel owned by Coosa Pines in St. Clair County, Alabama (the "Property").  AF No. 1.  On October 4, 2007, Coosa Pines borrowed $575,000 from Riverbend Capital, LLC ("Riverbend") secured by a second

---

[2]   Keeping in mind that when deciding a motion for summary judgment the court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party). This statement does not represent actual findings of fact.  *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007).  Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy.

mortgage on the Property.  AF No. 2.1.  The Riverbend mortgage was recorded on January 31, 2008.  AF No. 2.2.

On April 16, 2008, Coosa Pines conveyed the Property to Georgia Commercial Stores, Inc. ("Georgia Commercial") for $310,000 without satisfying the Mutual Savings or Riverbend mortgages.  AF No. 3.1.  Georgia Commercial recorded its General Warranty Deed from Coosa Pines on April 21, 2008.  AF No. 3.2.

In April 2008, Charles P. Sanford ("Sanford"), Coosa Pines' principal/owner, approached Jarrod Pressley ("Pressley"), a loan officer with First Bank, regarding a potential loan of $750,000 to Coosa Pines.  AF No. 4.  Sanford offered to secure the prospective loan from First Bank with a mortgage on the Property.  AF No. 5.1. Sanford told Pressley that he (or an entity owned by him) owned the Property at that time free and clear of any encumbrances.  AF No. 5.2.  The terms of the loan were that it was to be due in six months, the amount loaned was to be $750,000, the interest was to be 8% interest, and repayment was to be by one single balloon repayment due on December 1, 2008.  AF No. 6.

At some point prior to May 8, 2008, a title commitment from Land Title Company ("Land Title") was ordered for the prospective loan.  AF No. 7.  Land Title is a title agency located in Birmingham and is a party to an "Issuing Agency Contract" with Chicago Title.  (Doc. 31 at Ex. 5 at D's Ex. 15).  First Bank received

two different versions of a title commitment (# 3057A-08) from Land Title relating to the Property, although the record is not entirely clear on the order in which they were received.  Both versions of the title commitment were dated May 5, 2008.  One version ("Land Title Commitment A") disclosed the Mutual Savings and Riverbend mortgages as existing encumbrances on the Property and also showed title in the Property vested in Georgia Commercial, rather than the proposed borrower, Coosa Pines.  (Doc. 31 at Ex. 5 at Ex. 11).

The other version ("Land Title Commitment B") was received by First Bank from Sanford.  This version did not reference the Mutual Savings and Riverbend mortgages.  AF No. 9.2.  Also, Land Title Commitment B showed title to the Property vested in Coosa Pines.  AF No. 9.3.  After receiving these two varying versions of the Land Title commitment, Pressley and First Bank's president and CEO, Jared Kirby ("Kirby"), discussed them and noticed the differences.  AF No. 10.

On May 15, 2008, Pressley and Amy Niesen ("Niesen"), Land Title's general counsel, had phone communications about the differing versions of the Land Title commitment.  AF No. 11.1.  The exact nature of those discussions is disputed.  Also on May 15, 2008,  Pressley faxed to Niesen Land Title Commitment B.  AF No. 11.2.  Subsequently, Niesen  faxed and emailed to Pressley what she claimed was the only commitment for insurance through Chicago Title that Land Title had issued–Land

Title Commitment A.  AF No. 13;  (Doc. 31 at Ex. 5 at Exs. 10-11).

Pressley has testified that he asked Sanford about the variances between Land Title Commitment A and Land Title Commitment B and that Sanford told Pressley that he would get those issues worked out.  AF No. 14.1.  Pressley testified that, a few days later, Sanford called Pressley and told him that he would present the Property as being vested in Coosa Pines with no liens or encumbrances.  AF No. 14.2.

Pressley never asked Sanford for documentation showing that he paid off the two mortgages.  AF No. 15.  Pressley never contacted Georgia Commercial concerning title to the Property.  (*Id.*)  Pressley never contacted Mutual Savings or Riverbend to check on the status of their respective mortgages on the Property.  (*Id.*)  Pressley never received any documentation regarding the issues concerning title to the Property or the two prior existing mortgages on the Property.  (*Id.*)  First Bank engaged an attorney who advised it at the time of closing that all issues, including the mortgage and title issues, had been released.  (Doc. 34 at 3-4 ¶ 15).

On May 22, 2008, without informing Land Title, First Bank switched title companies and engaged St. Clair Title, also one of Chicago Title's limited title issuing agents, to issue a title commitment insuring First Bank in connection with the same proposed loan to Coosa Pines.  AF No. 16.  On the morning of May 22, 2008, after receiving the order from First Bank and reviewing title to the Property, Janice

Dunaway ("Dunaway"), on behalf of St. Clair Title, spoke with Pressley on the phone and told him that there was a deed to the Property from Coosa Pines to Georgia Commercial and two prior existing mortgages of record. AF No. 17.1. In response, Pressley stated that the deed was a mistake, and the two mortgages should have been released. AF No. 17.2.

On May 22, 2008, at 12:39 p.m., purported releases of the Riverbend and Mutual Savings mortgages on the Property were recorded. AF No. 18. On May 22, 2008, sometime after 12:39 p.m. and after Dunaway's phone call with Pressley, Sanford personally visited St. Clair Title's offices. AF No. 19.1. While at the office, Sanford provided Dunaway with copies of the two purported mortgage releases and told Dunaway that he had just recorded them. AF No. 19.2. Because Dunaway needed to verify the recording of the releases, she went to the courthouse later that same day and found that the purported releases for the Riverbend and Mutual Savings mortgages had been recorded. AF No. 20.

St. Clair Title issued a title commitment (# 02244-08) (the "St. Clair Commitment") with an effective date of May 22, 2008, to First Bank for a lender's title insurance policy to be underwritten by Chicago Title. AF No. 21.1. The St. Clair Commitment showed title to the Property vested in Georgia Commercial, not Coosa Pines. AF No. 21.2. The St. Clair Commitment did not identify the Riverbend

or Mutual Savings mortgages on the Property.  AF No. 21.3.  St. Clair Title faxed the St. Clair Commitment to First Bank on May 28, 2008.  AF No. 21.4.

On this same date, St. Clair Title faxed an invoice to First Bank for the title insurance in the amount of $1,831.50.  AAF No. 30.1.[3]  The $1,831.50 premium was paid in full by First Bank.  AAF No. 30.2; AAF No. 40.1.  Chicago Title never actually issued or delivered a policy of title insurance to First Bank.  AAF No. 40.3. As Chicago Title explains, the policy that "would have been issued . . . would have been an American Land Title Association (ATLA) 2006 Loan Policy of Title Insurance."  (Doc. 33 ¶ 40).

On May 30, 2008, the closing was held for the mortgage transaction in which First Bank loaned $750,000 to Coosa Pines secured by a mortgage on the Property (the "First Bank Mortgage").  AF No. 26.  Despite the policy's not having been issued, Chicago Title acknowledges that First Bank became an insured on June 3, 2008, the date the First Bank Mortgage was recorded.  AAF No. 41.  On June 18, 2008, Riverbend foreclosed its mortgage on the Property and was the high bidder at the foreclosure sale.  AF No. 27.

On June 25, 2008, Mutual Savings filed an affidavit with the St. Clair County

---

[3] "AAF" refers to facts offered by First Bank in Doc. 30 that have been admitted by Chicago Title in Doc. 33.

Probate Court stating that the release of its mortgage was a forgery.  AF No. 28.

Sometime after June 25, 2008, Mutual Savings foreclosed its mortgage, which was

superior to Riverbend's mortgage.  AF No. 29.

Coosa Pines ultimately defaulted on the First Bank loan.  AF No. 30.1.  First

Bank lost its collateral because of the two prior existing mortgages on the Property.

AF No. 30.2.  On July 14, 2008, First Bank submitted a claim for coverage to

Chicago Title under the title insurance policy (the "Non-Issued Policy") relating to

the St. Clair Commitment.   AF No. 31.

After conducting an investigation, the quality of which the parties dispute,

Chicago Title denied First Bank's claim by letter dated October 9, 2009.  AF No. 33.

In this letter, Chicago Title asserts that it is entitled to rescission of the Non-Issued

Policy based on First Bank's failure to disclose to Chicago Title's agent numerous

misrepresentations by Coosa Pines that were material to the risk or hazard sought to

be assumed by Chicago Title.  AF No. 33.  Chicago Title also asserts that multiple

exclusions apply to preclude coverage.  On October 9, 2009, the date of the denial,

Chicago Title also commenced this declaratory judgment action against First Bank.

AF No. 34.

> **B.    Contractual Provisions**
>
> > **1.    St. Clair Commitment Conditions**

The St. Clair Commitment contains the following condition relating to a proposed insured's duty to disclose actual knowledge of certain information:

> If the proposed Insured has or acquired actual knowledge of any defect, lien, encumbrance, adverse claim or other matter affecting the estate or interest or mortgage thereon covered by this Commitment other than those shown in Schedule B hereof, and shall fail to disclose such knowledge to the Company in writing, the Company shall be relieved from liability for any loss or damage resulting from any act of reliance hereon to the extent the Company is prejudiced by failure to so disclose such knowledge.  If the proposed Insured shall disclose such knowledge to the Company, or if the Company otherwise acquires actual knowledge of any such defect, lien, encumbrance, adverse claim, or other matter, the Company at its option may amend Schedule B of this Commitment accordingly, but such amendment shall not relieve the Company from liability previously incurred pursuant to paragraph 3 of these Conditions.

(Doc. 29-9 at 91 (SC 0228) ¶ 2).

Another condition states:

> This Commitment is a contract to issue one or more title insurance policies and is not an abstract of title or a report of the condition of title. Any action or actions or rights of action that the proposed Insured may have or may bring against the Company arising out of the status of the title to the estate or interest or the status of the mortgage thereon covered by the Commitment must be based on and are subject to the provisions of this Commitment.

(Doc. 29-9 at 91 (SC 0228) ¶ 3).

## 2.   Non-Issued Policy Provisions

Exclusions from coverage under the Non-Issued Policy include:

Defects, liens, encumbrances, adverse claims, or other matters:

(a)    created, suffered, assumed, or agreed to by the Insured Claimant;

(b)    not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy[.]

(Doc. 29-7 at 189 ¶ 3).

## IV.   ANALYSIS

### A.    Preliminary Considerations

#### 1.    Applicable Law

Both sides embrace Alabama law as applicable to the parties' controversy.  As the Eleventh Circuit has succinctly summarized when a dispute is premised upon a federal court's diversity jurisdiction:

> Except in matters governed by federal law, when as here a federal court's jurisdiction is predicated upon the diversity of citizenship of the parties, the federal court must apply the substantive law of the state in which it is sitting. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); *Shirey v. Louisville & Nashville R.R. Co.*, 327 F.2d 549 (5th Cir. 1964). If, in a diversity case, the court is required to construe an insurance contract, the federal court will apply applicable state law. *Ruhlin v. New York Life Ins. Co.*, 304 U.S. 202, 58 S. Ct. 860, 82 L. Ed. 1290 (1938). When there is a question as to which state law should be applied, the federal court must follow a conflict of laws rule which conforms to those prevailing in the state in which it sits; viz., the conflict of laws rules of the state.  *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941).  The

purpose of applying the state law of the forum is to assure equal administration of justice in coordinate state and federal courts. *Ibid. See also Sampson v. Channell*, 110 F.2d 754 (1st Cir.), *cert. denied*, 310 U.S. 650, 60 S. Ct. 1099, 84 L. Ed. 1415 (1940).

*Maryland Cas. Co. v. Williams*, 377 F.2d 389, 392-93 (5th Cir. 1967) (emphasis added).

Because the parties do not present any questions about conflict of laws, because First Bank is an Alabama banking corporation with its principal place of business in Randolph County, Alabama (Doc. 1 ¶ 2), and because the Property securing the loan upon which Coosa Pines defaulted is located in St. Clair County, Alabama, the court will, consistent with the above guidance from *Williams*, decide these cross-motions under Alabama law.

### B.    Chicago Title's Motion

#### 1.    Rescission

Section 27-14-7 of the Alabama Code sets forth a statutory right to rescission of an insurance contract, however, § 27-14-2(4) establishes that § 27-14-7 does not apply to title insurance. As a result, Chicago Title's right to rescind, if any, must be premised upon common law.

Chicago Title never issued an actual title insurance policy to First Bank. Further, in attempting to rescind its agreement to provide First Bank with title

insurance, Chicago Title has offered no proof that it ever refunded the premiums paid by First Bank in consideration for the St. Clair Commitment.  Under Alabama law, "it is settled that acceptance of premiums by an insurer, after learning of a breach of a condition or ground for forfeiture, normally constitutes a waiver or estoppel.  Also, the insurer must return the premiums within a reasonable time to avoid waiver or estoppel from arising from the acceptance of premiums in such a situation."  *Henson v. Celtic Life Ins. Co.*, 621 So. 2d 1268, 1277 (Ala. 1993) (citation omitted).

Long-standing common law authority on contracts confirms this principle of waiver or estoppel.  *See, e.g., Life & Cas. Ins. Co. v. Eubanks*, 19 Ala. App. 36, 38, 94 So. 198, 199 (Ala. Ct. App. 1922) ("The right to insist upon a forfeiture of a liability under a contract being a right which may be waived by the party in whom the right resides, <u>such waiver may be implied from conduct inconsistent with the intention to exercise it, for neither party to a contract may receive the benefits accruing thereunder and avoid the liabilities created thereby</u>." (emphasis added) (citing *Romanoff Land & Mining Co. v. Cameron*, 137 Ala. 214, 217, 33 So. 864, 865 (Ala. 1930))); *Eubanks*, 94 So. at 200 ("We, therefore, hold that if said collecting agent was authorized to receive payments from the insured after the same were in default, then the knowledge of such agent of the insured's default was the knowledge of the insurance company, and, if so, then the acceptance of the premium was a

waiver of the forfeiture."); *Romanoff*, 33 So. at 865 ("This upon the principle that 'the person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract or abandon the transaction, and give the other party an opportunity of rescinding it, and of restoring both of them to their original position.'"); *id.* at 865 ("He is not allowed to go on and derive all possible benefits from the transaction, and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his own part.").

Here, because there is no evidence that Chicago Title ever returned premiums to First Bank after it discovered what it contended to be a breach of a condition to coverage, triable issues remain as to whether Chicago Title is entitled to common law rescission. More specifically, the potential for estoppel or waiver to apply here means that Chicago Title's right to rescind (and deny coverage to First Bank) may have been compromised by its retention of First Bank's premiums. In particular, the Supreme Court of Alabama has recognized that the interjection of the doctrine of estoppel very well may require factual determinations which make summary judgment inappropriate. *Cf. Brown*, 659 So. 2d at 57 ("Most importantly, this Court held that whether the brochure issued to the employees superseded the policy limitation and whether it estopped the insurer from denying coverage were factual questions for the jury to decide." (citing *Moses v. American Home Assurance Co.*, 376 So. 2d 656, 658

(Ala. 1979))).

Additionally, Chicago Title has not shown that it has a legal right to rescind in the absence of a title insurance policy issued by Chicago Title in favor of First Bank. Chicago Title's Motion lacks any on-point controlling case authority confirming that an insurer's common law right to rescind remains intact even though the insurer never issues the policy to the insured. The court is not obligated to address such an underdeveloped defense to coverage. *Cf. Flanigan's Enters., Inc. v. Fulton County, Ga.*, 242 F.3d 976, 987 n.16 (11th Cir. 2001) (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument); *Ordower v. Feldman*, 826 F.2d 1569, 1576 (7th Cir. 1987) (stating that an argument made without citation to authority is insufficient to raise an issue before the court).

Accordingly, for all these reasons, Chicago Title's Motion premised upon its right to rescind is **DENIED**.

### 2.    Non-Issued Policy Exclusions

Regarding its exclusionary-based defenses to coverage, Chicago Title relies upon the language of Exclusions 3(a) and 3(b) of the Non-Issued Policy, which are set out at Section III. B. 2. above. "[T]he insurer bears the burden of proving the applicability of any policy exclusion." *Universal Underwriters Ins. Co. v. Stokes*

16

*Chevrolet, Inc.*, 990 F.2d 598, 604 (11th Cir. 1993) (citing *Fleming v. Alabama Farm Bureau Mut. Cas. Ins. Co.*, 310 So.2d 200, 202 (Ala. 1975)).  Additionally, Alabama law calls for a narrow view of exclusions to provide the maximum coverage that a reasonable reading will allow.  *Porterfield v. Audubon Indem. Co.*, 856 So. 2d 789, 799-800 (Ala. 2002).

Accordingly,  "when doubt exists as to whether coverage is provided under an insurance policy, the language used by the insurer must be construed for the benefit of the insured." *St. Paul Mercury Ins. Co. v. Chilton-Shelby Mental Health Ctr.*, 595 So. 2d 1375, 1377 (Ala. 1992).  However, "[i]f there is no ambiguity, courts must enforce insurance contracts as written and cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties." *Id.*

Having studied both provisions and the case law relied upon by Chicago Title, the court rejects Chicago Title's exclusion-based arguments for summary judgment. In particular, the record shows that Chicago Title never issued, much less delivered, a policy to First Bank.  Also, Chicago Title has not established that it ever provided standard policy language from the Non-Issued Policy to First Bank until after the coverage dispute ensued.

Because the record does not affirmatively establish that Chicago Title ever

17

issued, delivered, or supplied standard policy language from the Non-Issued Policy to First Bank, its ability to rely upon exclusions under the Non-Issued Policy that might apply to support summary judgment is problematic.[4]  As the Supreme Court of Alabama explained when answering a certified question in *Brown Mach. Works & Supply Co., Inc. v. Insurance*, 659 So. 2d 51 (Ala. 1995):

> We find that the clear weight of the persuasive authorities stands for the proposition that, where a statute requires delivery of a policy to the insured and the insurer fails to deliver the policy according to the statute, the insurer may be estopped from asserting coverage conditions or exclusions that are in the policy but are not disclosed to the insured. . . .  The basic answer to the first certified question is yes, in a breach of contract action when an insurer fails to deliver a copy of the policy to an insured in accordance with Ala. Code 1975, § 27-14-19, the insurer may be estopped from asserting an otherwise valid exclusion.

---

[4]  The court acknowledges Chicago Title's position that First Bank's receipt of the language in Condition 2 as part of the St. Clair Commitment cures any defect relating to First Bank's not having been provided a copy of the Non-Issued Policy 3(b) exclusion due to the substantial similarity between the provisions and the lack of any resulting prejudice caused to First Bank.  (Doc. 36 at 7-8).  None of the cases cited by Chicago Title arises in the context of title insurance, and, therefore, the authorities do not stand directly for the proposition that the delivery of conditions to an insured by way of a title commitment is sufficient to put an insured on notice of exclusions against coverage.  However, even assuming that Chicago Title is correct on this point (*i.e.*, Condition 2 of the St. Clair Commitment and the Non-Issued Policy 3(b) exclusion are comparable and First Bank can show no prejudice), reasons alternative to waiver or estoppel still support a denial of its Motion to the extent it is premised upon these exclusions.

659 So. 2d at 57, 61 (emphasis added).[5]

To the extent that this court has been able to independently locate Alabama case law on enforcement of title insurance exclusions, the circumstances have involved an already issued policy. *See Conway v. Title Ins. Co.*, 291 Ala. 76, 277 So. 2d 890, 892 (Ala. 1973) ("This same title defect was present and known to the appellant or her agents at the time she procured the policy of title insurance from the appellee."); *Conway*, 277 So. 2d at 893 ("It is not uncommon for title insurance policies to contain clauses excluding or excepting from coverage 'defects, liens, encumbrances, or adverse claims against the title as insured, or other matters' when such defects are created, suffered, agreed to or assumed by the insured, and are known to the insured at the date of the policy, but are not shown by the public

---

[5]  Section 27-14-19(a) of the Alabama Code provides:

Subject to the insurer's requirements as to payment of premium, every policy shall be mailed or delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance, except where a condition required by the insurer has not been met by the insured.

Ala. Code § 27-14-19(a).  While this particular statutory requirement of delivery does not expressly apply to title insurance by virtue of § 27-14-2(4), the court nevertheless believes that the reasoning of *Brown* is appropriately extended as persuasive authority to situations in which an insurer is attempting to rely upon an exclusion in a title insurance policy that was never issued, delivered, or otherwise provided to the intended insured, especially in the absence of any controlling Alabama authority suggesting otherwise.

records, nor disclosed to the insurer by the insured in writing.").

Chicago Title has not cited to any on-point controlling Alabama authority (or case law from other jurisdictions for that matter) which indicates that exclusions are routinely enforceable in a title insurance dispute when the insured never received a copy of the policy and, instead, only received conditions to coverage by way of a commitment.  *Cf. Flanigan's*, 242 F.3d at 987 n.16 (holding that a party waives an argument if the party "fail[s] to elaborate or provide any citation of authority in support" of the argument); *Ordower*, 826 F.2d at 1576 (stating that an argument made without citation to authority is insufficient to raise an issue before the court). Moreover, the potential for estoppel to apply here means that Chicago Title cannot demonstrate that the exclusions bar coverage for First Bank as a matter of law due to the fact-intensive nature of such an estoppel inquiry, as previously discussed.

Alternatively, even if consideration of the exclusions is appropriate despite the fact that no policy was issued, Chicago Title has not adequately demonstrated how the first exclusion upon which it relies applies in this instance to preclude coverage. More specifically, based upon the current record before it, reasonable minds could differ as to whether First Bank had actual knowledge of a title defect.  (*Cf.* Doc. 28 at 18-19 ("However, this representation was incorrect, and there was, in fact a recorded federal income tax lien against them, <u>which the bank knew based upon the</u>

borrowers' credit report, as well as a Fannie Mae Underwritings Filings Report which reflected the lien and stated that it must be paid prior to or at closing.") (emphasis added)).

Exclusion 3(b) excludes from coverage "[d]efects . . . or other matters not Known to [Chicago Title] . . . but Known to [First Bank] and not disclosed in writing to [Chicago Title] by [First Bank] prior to the date [First Bank] became an Insured under this [P]olicy." Regarding this second exclusion, material factual disputes exist for the trier of fact to resolve regarding what knowledge should be imputed to Chicago Bank by virtue of the information known by its title agents. *Cf. Eubanks*, 94 So. at 200 ("And if said agent had knowledge that the insured had been injured and was confined in a hospital at the time of the acceptance of said premiums so in default, then this knowledge was imputable to the insurance company."). Further, depending upon the scope of that imputed knowledge, Chicago Bank may be precluded from relying upon the second exclusion, due to the extent to which "defects" or "other matters" were "known" to it. In sum, Chicago Title has not met its affirmative burden as the movant on its exclusions-based defense and that portion of its Motion is also **DENIED**.[6]

---

[6] As the court has denied Chicago Title's Motion on all coverage-related issues, Chicago Title's efforts to obtain summary judgment on First Bank's counterclaims are concomitantly **DENIED**.

**C.      First Bank's Motion**

First Bank maintains that it is entitled to summary judgment on Chicago Title's

decision not to honor its title insurance claim.   More specifically, First Bank

summarizes:

> Because there are no issues in material fact and because First
> Bank is entitled to judgment as a matter of law on Chicago Title's claims
> for rescission and declaratory relief, First Bank is entitled to a judgment
> of law that Chicago Title must indemnify First Bank for its loss as a
> result of the existing mortgages, which were foreclosed, voiding First
> Bank's mortgage on the 440 acres.   First Bank, therefore, respectfully
> requests this Court to enter judgment in its favor.

(Doc. 30 at 32).

The court finds the merits of First Bank's Motion to be inextrically factually

intertwined with the merits of Chicago Title's Motion.   As a result, akin to Chicago

Title's Motion, material factual disputes preclude the entry of summary judgment in

First Bank's favor.   Accordingly, First Bank's Motion is likewise **DENIED**.

**V.      CONCLUSION**

For all the reasons explained above, both Chicago Title's Motion and First

Bank's Motion are **DENIED**.   By separate order, the court will set this case for a final

pretrial conference.

**DONE** and **ORDERED** this the 30th day of January, 2012.

**VIRGINIA EMERSON HOPKINS**
United States District Judge